IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Hilda Renee Tribble-Toney, ) | C/A No.: 3:15-1070-TLW-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND RECOMMENDATION |
| ) | |
| Palmetto Health Baptist Hospital, ) | |
| ) | |
| Defendant. ) | |
| ) | |

In this employment discrimination case, Hilda Renee Tribble-Toney ("Plaintiff") sues her former employer, Palmetto Health Baptist Hospital ("Defendant"), alleging race discrimination based on wrongful discharge and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq*. ("Title VII"), and intentional infliction of emotional distress.[1] [ECF No. 1-1]. This matter comes before the court on Defendant's motion for summary judgment filed on February 22, 2016. [ECF No. 20]. The motion having been fully briefed [ECF Nos. 20, 23, 24], it is ripe for disposition.[2]

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.). Because the motion is dispositive, this report and recommendation is entered for the

---

[1] The court previously granted Defendant's motion to dismiss Plaintiff's cause of action for age discrimination based on Plaintiff's failure to file an administrative charge with the Equal Employment Opportunity Commission ("EEOC") and the South Carolina Human Affairs Commission ("SHAC"). [ECF No. 7].

[2] Defendant argues that Plaintiff's Response was untimely and therefore should not be considered. Reply Br. at 2–5. Because Defendant has not suffered any prejudice as a result of Plaintiff's untimely filing, the undersigned declines to strike her response.

district judge's consideration. For the reasons that follow, the undersigned recommends Defendant's motion for summary judgment be granted.

I.     Factual Background

Plaintiff began working for Defendant in 1996. Pl. Dep. 17:13–15.[3] She initially worked as a nurse tech in the geriatric psychiatry department, but later performed jobs as a patient care technician and a unit secretary. Pl. Dep. 27:5–13; ECF No. 20-2 at 69–76. She denied having experienced racial discrimination during the period she was employed in these positions. Pl. Dep. 32:16–33:3. Plaintiff received corrective action reports related to excessive absenteeism in November 1998, May 2000, and May 2003, and to unsatisfactory work performance in August 2008.[4] Pl. Dep. 68:1–69:25, 72:1–13, 75:1–14; ECF No. 20-2 at 71–77. All of these corrective actions resulted in Plaintiff receiving constructive advice. [ECF No. 20-2 at 71–77].

On February 8, 2009, Plaintiff transferred to Baptist Inpatient Medical Associates ("BIMA"), a hospitalist group that serviced the hospital's inpatient clients. Pl. Dep. 27:22–28:2, 30:2–11, 30:16–31:7; ECF No. 20-2 at 69. Plaintiff was hired as an administrative coordinator, and her primary job duties were to code medical procedures and charge patients.[5] Pl. Dep. 31:8–14; ECF No. 20-2 at 70. Plaintiff's job duties also

---

[3] Excerpts from Plaintiff's deposition may be found at ECF No. 20-2.
[4] The corrective action report was filed after Plaintiff improperly coded a patient's medical billing information. [ECF No. 20-2 at 77]. Plaintiff's error resulted in a loss of hundreds of thousands of dollars in revenue because Defendant was not paid for home health services the patient received upon discharge. *Id.* The report reflected that Plaintiff had received training regarding coding errors through several unit meetings. *Id.* Plaintiff was also warned that future coding errors may result in disciplinary action. *Id.*
[5] A job description for "administrative coordinator" dated November 23, 2011, does not indicate a specific requirement to perform medical billing or to be proficient in medical

2

included handling a wide variety of clerical and administrative functions. [ECF No. 20-2 at 70]. Plaintiff was supervised by physicians' office manager Tammy Herring ("Herring"), who had previously worked as the administrative coordinator. Pl. Dep. 28:20–24, 31:15–16; ECF No. 20-2 at 100.

The billing procedure initially involved inputting data on an Excel spreadsheet based on the diagnostic and billing codes the doctors included in their consultative notes and transferring the diagnostic and billing codes into the billing system for each patient. Pl. Dep. 37:16–24, 38:13–16, 53:1–4, 114:1–7. In or around February 2010, BIMA switched its billing process to the Practice Plus ("Plus") billing system, which eliminated the need to use the Excel spreadsheets. Pl. Dep. 103:1–12, 104:15–18; [ECF No. 20-2 at 81, 83]. Plaintiff received two-and-a-half days of training for Plus and additional training over the telephone. Pl. Dep. 208:8–24. She also participated in multiple training meetings.[6] *Id.*

On August 25, 2009, Plaintiff received a disciplinary action report from Herring for excessive absenteeism, after missing work on February 20, March 9, April 2, May 5–8, May 26–28, June 17, July 27, August 24, and August 26–28 Pl. Dep. 75:19–77:17;

---

coding. [ECF No. 20-2 at 70]. However, Plaintiff testified that she "understood the job to be coding and charging, the charging system for the patients that they've seen." Pl. Dep. 30:12–15.

[6] Herring's notes reflect that Plaintiff was referred for additional training in Plus in March 2010, but that she declined additional training in Excel. [ECF No. 20-2 at 84]. Herring indicated she sat down and observed Plaintiff as she entered charges on March 23, 2012. [ECF No. 20-2 at 87]. She noted that she explained to Plaintiff the reasons for some of the mistakes she was making. *Id.* She also indicated she sat down with Plaintiff on February 15, 2013, and discussed mistakes Plaintiff was making with billing entries. *Id.* at 89. She stated she spent two hours explaining the step-by-step processes Plaintiff should perform in her daily office duties. *Id.* Herring indicated she explained to Plaintiff the errors she was making in coding charges on March 14, 2013. *Id.*

3

[ECF No. 20-2 at 78–79]. Plaintiff did not consider this warning to be racially-motivated and acknowledged that Herring provided her information on the Family and Medical Leave Act ("FMLA"). Pl. Dep. 76:20–77:17; ECF No. 20-2 at 79.

Plaintiff had difficulty meeting Defendant's expectations to enter billing data accurately and in a timely manner throughout her period of employment at BIMA.[7] Pl. Dep. 104:6–15. Herring issued a disciplinary action report in February 26, 2010, because Plaintiff had not entered physicians' charges in the billing system at the end of the month. Pl. Dep. 105:23–106:19; ECF No. 20-2 at 80–81. Herring offered Plaintiff constructive advice. [ECF No. 20-2 at 80]. Plaintiff did not consider this disciplinary action to be racially-motivated. Pl. Dep. 108:3–9. Plaintiff received a written warning and constructive advice on March 5, 2010, after she entered into the billing system a physician's charges for the wrong day. Pl. Dep. 108:13–110:22; ECF No. 20-2 at 82–83. Herring referred Plaintiff to an additional training session for the Plus billing program because she was not entering the charges in a timely manner. Pl. Dep. 103:13–104:1.

In February or March 2010, Plaintiff and Herring agreed to have regular meetings.[8] Pl. Dep. 115:1–10; ECF No. 20-2 at 84. Herring spoke with Plaintiff about her

---

[7] Plaintiff stated when she returned for the second training in Plus, the instructor determined she did not lack understanding of the process, but instead had difficulty maintaining the proper pace. Pl. Dep. 103:16–104:14. She was not entering the data quickly enough to meet the demands of her job. Pl. Dep. 104:9–14. She stated that immediately upon being hired she noticed difficulty entering the charges as timely as expected. Pl. Dep. 105:6–15. She never reached a point where she was not behind in entering charges. Pl. Dep. 105:16–18.

[8] Herring documented meetings with Plaintiff in March 2010, July 2010, August 2010, September 2010, January 2011, July 2011, August 2011, October 2011, November 2011, December 2011, February 2012, March 2012, April 2012, August 2012, November 2012, December 2012, February 2013, and March 2013. [ECF No. 20-2 at 86–89].She indicated

4

failure to enter charges in the billing system for particular days, and Plaintiff agreed that Herring's criticism was valid. Pl. Dep. 131:12–23; ECF No. 20-2 at 84. Plaintiff also failed to deliver progress notes to the floor on a day that she was scheduled to do so, and Plaintiff admitted that Herring's criticism was valid. Pl. Dep. 131:24–132:11, 134:5–8; [ECF No. 20-2 at 84]. Plaintiff agreed that Herring appropriately criticized her for entering duplicate charges in the billing software and failing to send spreadsheets to the billing office each day. Pl. Dep. 133:9–24, 134:9–135:5.

On January 21, 2011, Herring issued a written warning that addressed Plaintiff's failure to enter charges into the billing system on multiple occasions. Pl. Dep. 135:21–137:16; ECF No. 20-2 at 90–91. The warning stated Plaintiff failed to enter 21 charges in September; 18 charges in October, including charges for entire floors on some dates; 3 charges in November; and 112 charges in December. Pl. Dep. 136:8–137:16; ECF No. 20-2 at 91. Plaintiff signed the disciplinary action report and admitted Herring's criticism was appropriate. Pl. Dep. 137:17–22; ECF No. 20-2 at 90. Herring wrote on the warning form that she expected the following of Plaintiff: (1) 100% accuracy for no missing charges; (2) 98% accuracy for errors in entering charges; (3) charges to be entered into Plus within two business days; (4) batch reports to be sent to Alesha Vanager daily; and (5) to sign off on daily close logs before Plaintiff faxed them. [ECF No. 20-2 at 91].

Herring completed Plaintiff's performance appraisal on December 30, 2011, and noted that Plaintiff needed to improve by charting and entering billing information for

---

Plaintiff failed to attend meetings on April 12, 2012, July 13, 2012, and September 13, 2012. [ECF No. 20-2 at 87]. Plaintiff denied having failed to report for any of the scheduled meetings. Pl. Dep. 166:5–14.

5

patients within two days and making sure that no charges were missed. Pl. Dep. 147:5–22; ECF No. 20-2 at 92–95.

Herring performed performance audits of Plaintiff's work on February 17 and 27, 2012. Pl. Dep. 154:3–6. The audits revealed Plaintiff's accuracy rates to be 56% and 53%, which was below the 98% accuracy rate Herring expressed to Plaintiff that she expected in January 2011. Pl. Dep. 154:12–18. Herring met with Plaintiff on March 8, 2012, to discuss the audit results. Pl. Dep. 154:25–154:12. Plaintiff admitted the performance audits reflected her actual performance and stated Herring legitimately criticized her performance. Pl. Dep. 154:19–24. Plaintiff agreed to double-check her work. Pl. Dep. 155:13–21. Herring audited Plaintiff's billing entries again on March 9, 2012, and found Plaintiff entered accurate charges for only one of the four patients audited. Pl. Dep. 155:22–25. On March 12, 2012, Herring imposed on Plaintiff a one-day suspension for unsatisfactory work performance. [ECF No. 20-2 at 96–97].

Herring audited Plaintiff's billing entries for September 28, 2012, and met with Plaintiff to discuss her omissions on October 29, 2012. Pl. Dep. 177:7–15; ECF No. 20-2 at 88. They met again on November 8, 2012, to discuss the results of another audit. Pl. Dep. 177:16–21; ECF No. 20-2 at 88. Herring indicated Plaintiff had neglected to verify insurance eligibility and had failed to add the missing charges from September 28. Pl. Dep. 177:19–178:9; ECF No. 20-2 at 88. She met with Plaintiff again on December 13, 2012, and pointed out that Plaintiff had neglected to add the charges that were indicated to be missing from September 28 and had included several duplicate entries. Pl. Dep. 178:10–23, 183:6–8; ECF No. 20-2 at 88.

6

On January 28, 2013, Herring suspended Plaintiff for three days without pay. [ECF No. 20-2 at 98–99]. Plaintiff was still entering charges on January 2, 2013, for the period from December 24–31, 2012. Pl. Dep. 184:20–23; ECF No. 20-2 at 99. She had not entered the charges for September 28, 2012, as of January 3, 2013. Pl. Dep. 182:22–183:2; ECF No. 20-2 at 88, 99.[9]

On February 15, 2013, Herring met with Plaintiff to discuss her job responsibilities. Pl. Dep. 199:2–7; ECF No. 20-2 at 89. Herring notified Plaintiff that charges were missing for January 10, 2013, and that she expected for those charges to be entered by February 18. Pl. Dep. 197:1–15l; [ECF No. 20-2 at 89]. Herring conducted audits on March 20 and 27, 2013, which revealed duplicate and missing charges. Pl. Dep. 199:11–18l; ECF No. 20-2 at 101. Plaintiff was discharged from her position on April 5, 2013. [ECF No. 20-2 at 100–01].

Plaintiff alleges that over her more than four years of employment at BIMA, Herring forwarded fewer than 10 emails to her that reflected African-American stereotypes regarding President Obama. Pl. Dep. 78:12–79:1–3, 79:13–15, 80:19–81:21. Plaintiff specified that some of these stereotypes involved watermelon and fried chicken and referred to the White House as the "Black House." Pl. Dep. 81:19–24. Plaintiff alleged that the emails began sometime after her August 25, 2009 disciplinary warning. Pl. Dep. 83:11–23. When she informed Herring that she found the emails offensive, Herring stopped sending them to her. Pl. Dep. 84:22–24, 85:16–22. Plaintiff claims Herring referred to President Obama as a "monkey" on three or four occasions when his

---

[9] Plaintiff admitted Herring legitimately criticized her failure to enter the charges from September 28, 2012. Pl. Dep. 183:3–5.

7

speeches were televised. Pl. Dep. 87:2–20. She asserts Herring commented that she refused to even look at interracial couples. Pl. Dep. 87:23–88:8. Plaintiff also alleges Herring asked her why "people so black" got tattoos when you could not see the tattoos on their skin. Pl. Dep. 89:15–23. Plaintiff did not express to Herring that she was offended by any of Herring's actions other than her forwarding of the emails. Pl. Dep. 90:1–5.

II.    Discussion

   A.    Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-

moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.     Analysis

1.     Wrongful Discharge[10]

To state a prima facie case of discrimination under Title VII, Plaintiff must prove: (1) she is a member of a protected class; (2) she was performing satisfactorily; (3) she suffered an adverse employment action; and (4) similarly-situated employees received more favorable treatment. *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (Title VII); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).

Defendant argues that Plaintiff cannot make out a prima facie case because she cannot show that she was performing her job satisfactorily. Plaintiff does not dispute that her job performance was unsatisfactory, but argues without supporting citation that "The second prong of McDonnell Douglas requiring satisfactory work performance is negated by the hostile racially-charged work environment addressed by the Supreme Court in *Faragher* and cannot be relied on by Defendant since it is directly responsible for the performance issue as previously discussed." [ECF No. 23 at 4]. Although *Fargaher v. City of Boca Raton*, 524 U.S. 775 (1998), addresses a hostile work environment claim, it

---

[10] To the extent Plaintiff seeks to bring a disparate treatment claim based on Herring's lack of discipline as the supervisor of Plaintiff's mistakes [ECF No. 23 at4], she has not shown that she and Herring were similarly-situated.

9

does not address how such a claim affects a wrongful discharge claim. Because Plaintiff fails to cite any law for the proposition that she can bypass part of her prima facie case for wrongful discharge based on an alleged hostile work environment claim, she has failed to present a prima facie case for wrongful discharge. Therefore, the undersigned recommends that Defendant be granted summary judgment on Plaintiff's wrongful discharge claim.

2.     Hostile Work Environment

Plaintiff also arguably asserts a hostile work environment claim under Title VII.[11] To establish a prima facie showing of a hostile work environment, Plaintiff must show that the offending conduct (1) was unwelcome, (2) was because of her race, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer. *Guessous v. Fairview Property Investments, LLC*, __ F.3d __, 2016 WL 3615780, *9 (4th Cir. July 6, 2016).

Defendant argues that Plaintiff has not shown that Herring's conduct was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive work environment. Specifically, Defendant argues that Herring's statements "look at that monkey" when President Obama was speaking on television carried no clear racial animus. Additionally, Defendant argues that the emails referring to President

---

[11] Defendant argues that Plaintiff's complaint did not assert a claim for hostile work environment. A review of her complaint reveals that Plaintiff conflated all Title VII claims into one cause of action, but she included allegations of racial slurs and alleged "That as a direct and proximate result of the hostile work environment created by the racially charged atmosphere of her place of employment[,] Plaintiff has suffered damages . . ." [ECF No. 1-1 at ¶¶ 19, 25].

10

Obama as living in "the Black House" and implicating racial stereotypes about watermelon and fried chicken are not actionable.

In *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015), the court discussed a hostile work environment claim based on the plaintiff having been called "porch monkey" in a threatening manner twice within a 24-hour period. The court stated:

> We also grasp that the use of Clubb's chosen slur—"porch monkey"—is about as odious as the use of the word "nigger." *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 185 (4th Cir. 2001). The latter epithet, of course, "is pure anathema to African-Americans." *Id.* Similarly, describing an African-American as a "monkey," and thereby "suggest [ing] that a human being's physical appearance is essentially a caricature of a jungle beast[,] goes far beyond the merely unflattering; it is degrading and humiliating in the extreme." *Id.; see also, e.g., Green v. Franklin Nat'l Bank of Minneapolis,* 459 F.3d 903, 911 (8th Cir. 2006) (recognizing that "[p]rimate rhetoric has been used to intimidate African–Americans" and that "[t]he use of the term 'monkey' and other similar words," including the variation "porch monkey," has "been part of actionable racial harassment claims across the country" (citing cases)). As we and several of our sister courts of appeals have recognized, "'[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.'" *Spriggs,* 242 F.3d at 185

*Id*. (additional citations omitted).

Defendant argues the instant case is distinguishable from *Boyer-Liberto* because the harasser in that case directed the slur to the plaintiff, and was physically intimidating, including screaming in the plaintiff's face. Reply Br. at 6–10. Defendant further argues the Fourth Circuit has previously entered summary judgment for employers "where the offensive or objectively racist remark at issue was not directed towards the complaining employee." *Id*. at 8. However, the Fourth Circuit recently reversed a district court's grant

11

of summary judgment in *Guessous*, 2016 WL 3615780, where the district court did not properly consider the totality of the circumstances and "took an overly cramped view of what constitutes race-based conduct." *Id.* at *12. More specifically, the *Guessous* court reversed a grant of summary judgment where remarks about the protected trait were made to the complaining party, even if not directly about the complaining party. *Id.* After considering the most recent Fourth Circuit jurisprudence, the undersigned finds that Plaintiff has presented an issue of fact as to whether Herring's conduct was sufficiently severe and pervasive for a hostile work environment claim.

As to the fourth element, Defendant argues that Plaintiff has not shown that Herring's conduct is imputable to it as the employer. Reply Br. at 10–12. In hostile work environment cases, "[t]he employer is strictly liable for the supervisor's harassing behavior if it culminates in a tangible employment action, but otherwise may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Boyer-Liberto*, 786 F.3d at 278 (citations omitted).

Plaintiff has not identified any evidence showing that Herring's behavior culminated in an employment action, as she testified that Herring's discipline regarding her performance was legitimate. Pl. Dep. 131:12–132:11; 133:9–137:25; 154:3–155:21. Additionally, Defendant took reasonable care to prevent harassing behavior by having a policy against harassment that also provided steps to report harassment. [ECF No. 24-1]. Plaintiff's complaint alleges she spoke to Division Director Mariam Dicks [ECF No. 1-2

at ¶ 20], and she argues in her response that she requested a transfer (Resp. Br. at 4). However, Plaintiff has not cited any evidence in the record before the court showing that she took advantage of the corrective opportunities Defendant provided.[12] Because Plaintiff has not shown that Herring's conduct was imputable to Defendant, Plaintiff has not proven all the elements of hostile work environment claim, and the undersigned recommends Defendant be granted summary judgment on Plaintiff's hostile work environment claim.

3. Intentional Infliction of Emotional Distress

Under South Carolina law, a plaintiff must establish the following elements to recover for the intentional infliction of emotional distress: (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. *Hansson v. Scalise Builders of South Carolina*, 650 S.E.2d 68, 70 (S.C. 2007). As explained by the

---

[12] Plaintiff's brief does not comply with Local Civ. Rule 7.05 (concerning content of responses); 1.05 (concerning format); nor 7.06 (concerning deadlines). Significantly, Plaintiff's brief does not cite to any evidence in the record and contains no exhibits. Fed. R. Civ. P. 56 requires much more of Plaintiff (and Plaintiff's counsel). Prior to the close of discovery, Plaintiff was deposed, at which time she was given the opportunity to state the facts on the record and be subjected to examination regarding those facts. Her failure to rely on the record facts in opposing summary judgment does not comply with Fed. R. Civ. P. 56(c)(1)(A), which provides that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." *See also* Fed. R. Civ. P. 56(e) (stating that a party must properly support her assertions of fact and properly address another party's assertions of fact).

South Carolina Supreme Court in *Hannson*, "the court plays a significant gatekeeping role in analyzing a defendant's motion for summary judgment[]" in order to prevent claims for intentional infliction of emotional distress from becoming a panacea for wounded feelings rather than reprehensible conduct[.]" 650 S.E.2d at 72 (internal quotations and citations omitted). The *Hannson* court noted that a plaintiff alleging an emotional distress claim bears a "heightened standard of proof." *Id*.

In the employment context, mere termination or unpleasant conduct by supervisors does not rise to the level of actionable outrage. *See, e.g., Alonso v. McAllister Towing of Charleston, Inc*., 595 F. Supp. 2d 645, 649–50 (D.S.C. 2009) (dismissing as a matter of law plaintiff's claim for intentional infliction of emotional distress because of termination and noting "having one's employment terminated is a stressful experience, but it can hardly be said to be an act so severe that no reasonable person could be expected to endure it.") (internal quotation omitted); *Shipman v. Glenn*, 443 S.E.2d 921, 922–23 (S.C. Ct. App. 1994) (holding a supervisor's actions of verbally abusing and threatening an employee with cerebral palsy with the loss of her job and ridiculing the employee's speech impediment to the extent the employee was physically ill and had to leave work early was insufficient to state a claim for intentional infliction of emotional distress); *Wright v. Sparrow*, 381 S.E.2d 503, 505–06 (S.C. Ct. App. 1989) (finding allegations that supervisor built a case to justify firing the plaintiff by loading her with responsibility while stripping her of authority and by changing the manner of performing certain duties and then accusing her of not following directions insufficient as a matter of law to constitute the tort of outrage); *Corder v. Champion Rd. Mach. Int'l Co.*, 324 S.E.2d 79,

14

81 (S.C. 1984) (holding that plaintiffs' allegation that they were fired in retaliation for exercising their legal rights was insufficient as a matter of law to constitute outrage); *but see McSwain v. Shei*, 402 S.E.2d 890, 891–92 (S.C. 1991) (holding that jury could find outrageous and intolerable the conduct of an employer who forced employee to perform exercises that exposed her incontinence problem to others); *Turner v. ABC Jalousie Co. of N.C.*, 160 S.E.2d 528, 530 (S.C. 1968) (holding plaintiff stated a cause of action where she alleged having suffered a nervous breakdown after defendant had used vile, profane, and abusive language).

Plaintiff provides no specific action that she alleges supports her claim for intentional infliction of emotional stress, but simply argues, without any citation to the record before the court, that she was forced to seek counseling due to the additional stress she had to endure. Based on the record before the court, and mindful of performing the role of gatekeeper as to Plaintiff's cause of action for intentional infliction of emotional distress, the court finds she has not alleged conduct that rises to the level of outrage under South Carolina law. *See Hannson,* 650 S.E.2d at 72; *see also Johnson v. Dailey*, 437 S.E.2d 613, 615 (S.C. 1995) (noting the court determines, as a matter of law, whether a plaintiff's complained-of conduct was "so extreme and outrageous it exceed[ed] all possible bounds of decency, and [was] regarded as atrocious and utterly intolerable in a civilized society.") (internal citations omitted).[13]

---

[13] Additionally, although not argued by Defendant, many courts have recognized that the South Carolina Workers' Compensation Act generally provides the exclusive remedy for personal tort injuries. *See, e.g., Dickert v. Metro. Life Ins. Co.*, 428 S.E.2d 700, 701 (S.C. 1993) ("[A]n employee's action against a company for intentional infliction of emotional distress and assault and battery caused by the action of another employee are within the

III.     Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendant's motion for summary judgment be granted.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

July 14, 2016                                             Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

---

scope of the [Workers' Compensation] Act since these actions arise from personal injury."); *Loges v. Mack Trucks, Inc.*, 417 S.E.2d 538, 540 (S.C. 1992) (holding that a claim of intentional infliction of emotional distress was barred by the exclusivity provision of the Workers' Compensation Act); *see also Strickland v. Galloway*, 560 S.E.2d 448 (S.C. Ct. App. 2002) (stating that the exclusivity remedy doctrine confers immunity "not only on the direct employer, but also on co-employees").

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).